# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:   1:22-cv-00423

JANE DOE,

      Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate;

      Defendant.

---

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

---

Plaintiff, JANE DOE, by and through her counsel, KATZ AND KERN LLP, hereby files this Complaint against Defendant, THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate ("Defendant Board"), and in support thereof, states and alleges as follows:

### INTRODUCTION

Plaintiff JANE DOE ("Plaintiff") is a highly-trained, highly-skilled, triple board-certified anesthesiologist, formerly employed ███████████ at the University of Colorado ("CU"). In her capacity at CU, Plaintiff taught and trained residents in CU's ████████ Department. Simultaneously, Plaintiff was employed at the Eastern Colorado Healthcare System ("ECHCS") of the Department of Veterans Affairs (hereafter, collectively referred to as the "VA"), where she was the sole Hispanic female doctor

Towards the latter part of her employment, Plaintiff witnessed dangerous conduct and deficiencies in the clinical setting, and consistent with CU's reporting requirements, reported same to ███████████ of CU's Office of Professionalism.  She explicitly advised ████████ not to

1

discuss same with ████████, to which he completely ignored.  After making this report, Plaintiff faced a pervasive pattern of retaliatory, discriminatory, harassing and hostile work environment, culminating in the ultimate termination of her clinical and academic appointments.  Despite having previously been deemed an "excellent" employee, Plaintiff's direct supervisor, ████████, initiated and effectuated a calculated, retaliatory plot to terminate Plaintiff and sabotage her VA appointment, conjuring false written complaints against Plaintiff and improperly transmitting same to the VA, without notice or the opportunity to contest.  Of significance, if such complaints were of any actual concern, ████████ should have made some efforts to immediately address same with Plaintiff, yet utterly failed to do so for several months.  Instead, ████████ has admitted under oath that she had no independent knowledge of any of the alleged complaints, thus elucidating her retaliatory motive.

Moreover, while Plaintiff was pregnant, ████████ baselessly removed her from supervising residents, again without notice, and refused to engage with Plaintiff to discuss the basis for same.  In addition, despite having been diagnosed with a dangerous and potentially life-threatening condition during her pregnancy, Plaintiff was forced to work in the operating room, exposing her to radiation contrary to her doctor's directive.  Plaintiff's lack of accommodation was designed to make her work life miserable, in further retaliation for her prior reporting.

As a result of ████████'s conjured complaints, Plaintiff was removed from her supervisory duties at CU, received a charge of unprofessional conduct, had her clinical privileges revoked, and was removed from federal service with the VA and accompanying employment with CU.  Plaintiff has been forced to expend over $900,000.00 to protect her medical license, avoid improper reporting to the Colorado Medical Board and National Practitioner Data Bank ("NPDB").  Her career as a cardiac anesthesiologist and critical care physician has been largely destroyed because of Dr. Todorovic.

The unfortunate reality is that ▮▮▮▮▮▮▮'s conduct is consistent with the pattern of retaliatory, hostile, and discriminatory practices perpetuated by her since arriving to CU's ▮▮▮▮▮▮▮ Department in 2016, those of which have been repeatedly ratified by Defendant Board. As such, Plaintiff brings this civil action for damages and other relief against Defendant Board under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* (1964) ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), the ADA Amendments Act of 2008, 42 U.S.C. § 12101(3)(A) ("ADAAA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*.

## THE PARTIES

1. Plaintiff JANE DOE ("Plaintiff") is a resident of the State of Colorado.

2. At all times relevant to this Action, Plaintiff was employed by Defendant Board at the Anschutz Medical Campus in Aurora, CO.

3. CU is a system of public universities in the State of Colorado consisting of four campuses: University of Colorado Boulder ("CU Boulder"), University of Colorado, Colorado Springs ("UCCS"), University of Colorado Denver ("CU Denver"), and the Anschutz Medical Campus ("CU Anschutz").

4. CU is engaged in the business of higher education and is established and regulated by Article IX, §§ 12 and 13, Colorado Constitution and State statutory law, and C.R.S. §§ 23-20-101, et seq. As a public institution, CU is subject to the requirements of the Colorado Constitution, the United States Constitution, and applicable federal law.

5. CU is operated and governed autonomously by Defendant Board.

6. As provided by the state constitution and state law, Defendant Board, duly elected, constitute a body corporate.

7.   Defendant Board exercises general supervision of CU and, subject to narrow exceptions, it has the exclusive control and direction of all funds of and appropriations to CU.

8.   Defendant Board, as CU's governing body, meets the definition of an "employer" under the applicable statutes, including Title VII, the ADA, and the Rehab Act.

9.   At all times relevant to this Complaint, ████████ was ████████████ ████████████ Chair of the Department at CU.

10.   Upon information and belief, ████████ is a woman of Serbian national origin and a member of the Eastern Orthodox faith.

11.   Throughout the entirety of Plaintiff's employment at CU, ████████ acted as Plaintiff's superior and supervisor and maintained decision-making authority as to Plaintiff's continued employment at CU.

## JURISDICTION AND VENUE

12.   This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

13.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices alleged to be unlawful were committed in the District of Colorado.

14.   Plaintiff has exhausted all administrative prerequisites to the filing of this action, including filing of a complaint with the United States Equal Employment Opportunity Commission ("EEOC") on February 24, 2021, Charge of Discrimination No.: 541202101186.

15.   This lawsuit was commenced within ninety (90) days of Plaintiff's receipt of a Notice of Right to Sue, dated November 18, 2021, from the United States Department of Justice, Civil Rights Division with respect to the aforementioned EEOC Complaint.

## FACTUAL ALLEGATIONS

16.     Plaintiff is triple board-certified ███████████████████████

███████████████████████.

17.     Plaintiff is a woman of Colombian ethnicity. She is currently ██ years old.

18.     Plaintiff was born in Bogota, Colombia.

19.     Plaintiff completed her medical training in Colombia in approximately 2002 with the intent to ultimately practice medicine in the United States.

20.     For approximately four (4) years thereafter, Plaintiff worked in an underprivileged community in Colombia, followed by a private medical practice, all while seeking placement in a U.S. medical training program.

21.     Plaintiff moved to the United States in 2006 after securing a spot at ███████ ███████████, where she completed her U.S. anesthesiology training by 2010.

22.     Thereafter, Plaintiff completed a fellowship in anesthesiology and critical care at ███████████████, and another fellowship in cardiovascular anesthesiology at ███████████ ████████.

23.     On September 15, 2014, Plaintiff became a full-time permanent employee of the VA pursuant to 38 U.S.C. 7401(1) as a cardiac anesthesiologist and critical care physician and therefore, was a Title 38 employee.

***Plaintiff's faculty appointment with Defendant CU and clinical appointment with the VA***

24.     In April of 2016, consistent with her employment with the VA, Plaintiff obtained a faculty appointment at CU and was tasked with supervising ███████████ residents from CU Anschutz during their rotations at the VA.

25.     Plaintiff's supervisory duties were in addition to her clinical duties as a medical doctor.

26.     The terms of Plaintiff's association required her to maintain a valid Colorado license to practice medicine as well as a faculty appointment, the latter of which she obtained through her employment at CU.

27.     As a condition of her employment at CU, Plaintiff agreed to perform her duties and responsibilities consistent with her rights and responsibilities as a faculty member and CU's policies and procedures, promulgated by Defendant Board.

28.     CU's Nondiscrimination Policy (the "Nondiscrimination Policy") and Procedures (the "Nondiscrimination Procedures" and collectively the "Nondiscrimination Policy and Procedures"), set forth a multitude of promises from CU to Plaintiff with respect to the prohibition against workplace discrimination, retaliation, harassment, and hostile work environment, and specifically the manner in which prohibited conduct must be handled within CU:

     a.  that CU prohibited discrimination, harassment, a hostile work environment, and retaliation, as well as the aiding and abetting of such actions, and that it maintained a defined procedure that it would necessarily follow whenever it received a complaint regarding same;

     b.  that any individuals who violated the Nondiscrimination Policy would be disciplined or subjected to corrective action;

     c.  that any responsible employee who witnessed or received information regarding possible discrimination or harassment would be obligated to promptly report the information to the Office of Equity ("OOE") or his or her designee and that all reports or complaints made pursuant to the Nondiscrimination Policy would be addressed promptly and as practicably as possible after the report is made in accordance with the Nondiscrimination Procedures;

     d.  that its Nondiscrimination Procedures complied with federal and state laws, their implementing regulations, and related federal/state agency guidance and that it was obligated to conduct at least a preliminary inquiry of any related complaints to determine whether the alleged conduct occurred in the context of, or has continuing effects on, a University program, activity or employment;

     e.  **that all of CU's faculty, staff and students were prohibited from retaliating against Plaintiff for bringing a report or complaint pursuant to the Nondiscrimination Policy or participating as a witness in an investigation conducted by the OOE and that "Retaliation [would] not be tolerated";**

f.   that CU would properly initiate an investigation, ensure that the investigator reviews all relevant documents, interviews relevant witnesses, views other evidence as may be available to conduct a full and thorough investigation, and shares all witness testimony with Plaintiff;

g.   that should she bring a report or complaint pursuant to the Nondiscrimination Policy, she would have the opportunity to (1) receive timely notice of his/her interview or meeting, (2) present relevant information to the investigator, including evidence and identifying witnesses; (3) have an advisor of his choice present during any interview, (4) review and respond to a summary of the relevant and material facts gathered during the investigation prior to a final determination being made, which such response must be included as part of the investigation by the investigator, (5) receive a copy of the summary of investigative findings at the conclusion of the investigation; and (6) receive, at the conclusion of an investigation, a written report that includes a statement of factual findings and a determination of whether the Nondiscrimination Policy was violated (hereinafter the "Decision");

h.   that a "preponderance of the evidence" (more likely than not) standard would be used to determine whether the alleged conduct violated University policies against discrimination and harassment; and

i.   that she could appeal the Decision on the grounds that the investigator exhibited unfair bias, failed to conduct a thorough investigation, or issued arbitrary findings and conclusions and that such appeal would be fully, fairly, and objectively reviewed.

29.    The Nondiscrimination Policy and Procedures were and remain consistent with Defendant Board's "Regent Law, Article 10", by which Defendant Board ensures that neither CU nor its officials discriminate on the basis of race, color, **national origin, pregnancy**, sex, age, disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status, political affiliation or political philosophy in admission and access to, and treatment and employment in, its educational programs and activities.

30.    Moreover, Plaintiff's employment was renewable at the end of each term.

31.    CU's longstanding pattern and practice was to renew these types of appointments annually, or the applicable term, absent a showing of cause for non-renewal.

32.    Upon information and belief, during the course of Plaintiff's employment, no faculty member holding such appointment was ever refused renewal without a justifiable cause.

33.     This longstanding practice is consistent with Defendant Board's Regents Law and Policies and the Rules of Defendant Board's School of Medicine ("SOM Rules"). Specifically, Article II, Section I of the SOM Rules states that at Plaintiff's request, the Dean or Chancellor or his/her representative must advise her of the reasons that contributed to a recommendation not to reappoint. Further, these Rules afforded Plaintiff the right to appeal to the Privilege and Tenure Committee should she believe that the proper procedures were not followed at any stage of the recommendation or review process.

34.     Of further significance, Defendant Board's Policy 5(B)(1)(C), also states, in no uncertain terms, that Plaintiff's reappointment "shall not be awarded or denied based on **extrinsic considerations** such as [her] expression of political, social, or religious views".

35.     In addition, Defendant Board's Law 5.C.4 states that faculty may be terminated "for cause" when "in the judgment of [Defendant Board] and subject to the [Defendant Board's] constitutional and statutory authority, the good of the university requires such action.  The grounds for dismissal for cause are limited to the following: (a) demonstrable professional incompetence; (b) conviction, whether by a plea or a verdict of guilty or following a plea of nolo contendere, for any felony or any offense involving moral turpitude; (c) violation of university policies pertaining to discrimination, sexual misconduct, or fiscal misconduct; (d) violation of the weapons control policy; (e) material or repeated neglect of duty; or (f) other conduct that falls below minimum standards of professional integrity.

36.     Defendant Board's Law 5.C.4 requires that "dismissal for cause proceedings" follow the rules and procedures stated in Defendant Board's Policy 5.E, which provide the faculty member an opportunity to contest the decision and be heard.[1]

***Plaintiff reports workplace hostility, inappropriate conduct,***

---

[1] Defendant Board's Policy 5.E is publicly available and may be found at https://www.cu.edu/regents/policy-5.

***and staffing deficiencies to CU's Office of Professionalism,
which results in a slew of discriminatory and retaliatory
behavior, that of which is tantamount to a hostile work
environment***

37.    Beginning in the spring of 2015 and continuing through the spring of 2017, Plaintiff

received consistently favorable performance evaluations at the VA, including such comments as:

"Doing well"; "Doing very well"; "Excellent"; a "paragon of skill, Knowledge and compassion for

all."

38.    However, by the summer of 2017, the anesthesia service at the VA exhibited

tremendous dysfunction, the pain clinic had been shuttered and cancellation of elective surgery was

anticipated

39.    Significantly, the practical consequence of understaffing anesthesiologists at the VA

was the re-routing of surgical patients to CU, which generated revenue to CU's ████████

Department through the Veterans Affairs Choice Program, which have much higher reimbursement

rates for services.

40.    Additionally, there was a risk of loss of Level 1A accreditation of the surgical

intensive care unit due to understaffing.

41.    Consistent with, among other things, her obligations pursuant to CU's ethical

standard of "institutional citizenship", Plaintiff reported to both CU and the VA the problems that

she observed with respect to the health care delivery at both institutions, largely focusing on the

general lack of accountability, doctors' failures to maintain consistent work schedules, and potential

risks to the health and safety of patients.

42.    Initially, on June 7, 2017, Plaintiff had a meeting with ████████ at of CU's Office

of Professionalism, reporting that a cardiovascular surgeon's conduct in the operating room had

placed a female veteran at severe risk, that CU did not provide adequate staffing to her work

location, and that colleagues were not working after their on-call days, thereby further reducing available anesthesia staffing.

43.     In reporting to ██████████, Plaintiff specifically expressed her desire that the report remain confidential, and that she did not authorize ██████████ to discuss same with ██████████ because she was aware that after another anesthesiologist had lodged a similar complaint, he had been removed from the cardiac intensive care unit by ██████████ in an effort to silence him.

44.     Upon information and belief, in contradiction to Plaintiff's express directive, ██████ ██████ informed ██████████ of Plaintiff's complaint, resulting in a slew of retaliatory conduct and a marked change in her employment, that of which was tantamount to a hostile work environment.

45.     Plaintiff further reported her concerns to VA management, and ultimately an investigation was conducted by the Office of the Medical Inspector, which resulted in a Congressional finding of a culture of hostility, unprofessional conduct, psychological unsafety, fear of reprisal and lack of communication based on avoidance, all originating within the Anesthesiology Department. The OMI also substantiated Plaintiff's allegations that her colleagues refusal to work while assigned to clinical duties exacerbated short staffing and resulted in the cancellation of hundreds of veterans in need of surgery.

46.     The OMI also substantiated that the VA Chief of Staff and Deputy Chief of Staff did nothing to fix the fraudulent staffing schedule created by Plaintiff's colleagues despite being fully aware of the problem. They were removed from their post subsequently.

47.     Because of the attendant publicity, Plaintiff was accused of bringing the matter to the press, which was patently false and further indicative of the retaliatory animus towards Plaintiff.

48.     Further, after reporting to CU and the VA, Plaintiff was assigned to supervise two new residents in their first month of anesthesiology training performing complex and high-risk

procedures, an assignment that deviated from internal department policy, hindered Plaintiff's ability to provide guidance, and compromised veterans' safety.

49.     Despite Plaintiff's explicit request to revise this unsafe assignment of cases, no remedial action was taken

50.     Thereafter, on August 15, 2017, Plaintiff again reported to ███████████ the worsening clinical conditions at the VA, noting VA management's failure to address the cancellation of surgeries for veterans that required same, and her concern about the unsafe conditions for critically ill veterans since VA management failed to recruit qualified candidates applying for the job.

51.     Plaintiff also reported to VA the risk posed by the access to narcotics by an impaired nurse anesthetist and investigation was commenced.

52.     Of note, contemporaneously with this report to ██████████, Plaintiff was electronically evaluated by CU residents, who reported that they valued Plaintiff's unique skillset, that Plaintiff took her commitment to teaching seriously, and that Plaintiff made an effort to contribute to the residents' educations.

53.     These evaluations included numerous positive and enthusiastic comments about Plaintiff's interaction with the residents.

**███████████ *effectuates a conspiracy to terminate Plaintiff based upon fraudulent and pretextually-conjured "complaints"***

54.     On September 19, 2017, approximately only one (1) month after Plaintiff reported her concerns, ███████████ met with the VA's Chief-of-Staff and told her about Plaintiff's complaints about her mismanagement of the agency

55.     Rather than investigating Plaintiff's concerns, ▮▮▮▮▮▮▮ engaged in and effectuated a conspiracy to remove Plaintiff from residents' supervision and use that as ammunition to fire Plaintiff.

56.     In an email addressing ▮▮▮▮▮▮ later that day, the VA's Chief-of-Staff inquired, "*Does the problematic anesthesiologist we discussed earlier today have an appointment at the U? Is she allowed to supervise residents?.  Would rather keep the name out of the e-mail…*".

57.     Although Plaintiff's name was intentionally excluded from the e-mail, Plaintiff was the only female in the Anesthesiology Department at that time.  There was no need whatsoever for ▮▮▮▮▮▮ to discuss the August 15, 2017 meeting with the Chief-of-Staff, save to conspire to remove Plaintiff from resident supervision, as a first step in and pretext for subsequent removal.

58.     ▮▮▮▮▮▮ responded in complete falsehood, stating "The faculty in question does not have an appointment at the U."

59.     Contrary to Defendant's statement, Plaintiff was appointed on May 1, 2016, as memorialized in correspondence dated April 11, 2016.

60.     ▮▮▮▮▮▮ continued in her email, "I am having a lot of complaints from the residents about her performance as an attending.  **I have asked them to put together a synopsis of their concerns.**  As soon as I get it from them, I will make sure to share that information with you. [emphasis added]".

61.     However, Plaintiff's evaluation report submitted just one month prior on August 15, 2017 showed satisfactory performance as faculty, and as stated above, her resident evaluations were exemplary.

62.     Todorovic solicited these "complaints" from residents, despite being fully aware that the ▮▮▮▮▮ Department at the VA was in extremis due to "short staffing".

63.     This email exchange demonstrates the orchestrated efforts by ███████ to take adverse employment action five (5) months prior to the summary suspension of Plaintiff's clinical privileges being issued on February 14, 2018.

64.     ███████'s systematic efforts towards adverse privileging action and removal is apparent, as she submitted the "complaints" from residents, yet failed to inform Plaintiff about any such purported concerns.

65.     More specifically, on October 19, 2017, ███████ e-mailed the VA's then-Chief of Staff the undated and anonymous negative reports about Plaintiff's supervision that ██ ███████ had solicited from four residents whom she held authority over.

66.     Plaintiff was not informed of this at the time and was allowed to continue to supervise residents.

67.     As a result of ███████'s conjured "complaints", the VA initiated an investigation of Plaintiff's clinical privileges (Focused Clinical Care Review), notably without ever providing Plaintiff with the necessary notice.

68.     Despite Plaintiff's exceptional prior performance evaluations, and after two years of receiving consistently favorable performance evaluations, on October 31, 2017, the VA issued an adverse proficiency report regarding Plaintiff.

69.     Incongruously and inconsistently, the adverse proficiency report encompassed the two-year time period of the consistently favorable performance evaluations.  Plaintiff was not provided the report until almost five months later vis a late March 15, 2018 e-mail, which only occurred after she had been summarily suspended.

70.     On December 19, 2017, ███████, along with several other CU faculty members, wrote a letter to the VA's Chief of ███████ Medicine, alleging complaints made about Plaintiff by certain residents (the "December 2017 Letter").

71.     In the December 17 letter, the faculty members, including Defendants Todorovic, stated that "at least 16 residents in the University of Colorado Anesthesiology Residency Program" had brought concerns regarding Plaintiff to her attention.

72.     Therein, the faculty members asserted that the residents had complained about Plaintiff's failure to communicate with the residents and failure to supervise.

73.     The letter essentially removed Plaintiff from supervising anesthesiology residents, despite the fact that neither CU nor the VA had ever previously raised with Plaintiff any concerns pertaining to her supervision of residents.

74.     On December 19, 2017, the VA's Chief of ███████████ Medicine noted that "while ████████ and [███████████] both stated that we could have until the beginning of the year to formulate a plan to remove her.." the VA's attorney informed leadership that they could not take action against Plaintiff without releasing the name of the accusers.  As stated therein, "the employee has due process rights, which means an opportunity to know the name of the people making the accusations."

75.     Plaintiff was not even informed of her removal until the letter was provided to her by the VA on or about January 8, 2018, at which time she was removed from supervising the residents.

76.     At this time, that residents had any such complaints was unknown to Plaintiff. Indeed, until then, Plaintiff had received numerous positive evaluations from residents, praising her teaching methods and showing appreciation for the training they received under her supervision. No prior concerns had ever been brought to her attention in this regard and no action plan was ever proposed, in violation of CU's bylaws.

77.     At that time, Plaintiff's supervisors did not engage her in any discussion about the situation or about a plan of action to correct the resident supervision issue, although she was told

that ECHS would do so.  Plaintiff herself made several attempts in January and February 2018 to set up a meeting to discuss the specific supervision concerns raised in the letter to find a resolution, but she was never able to obtain such a meeting.

78.     Logic further dictates that, had residents voiced valid and legitimate concerns, Defendants would have pursued them in a timely manner, rather than waiting three months before addressing them.

79.     Instead, these claims were instigated by ███████ *ex post facto* solely for the purpose of discrediting Plaintiff, a complainant who had identified violations of the Choice Act under federal law, and the sole Hispanic female in the VA's ███████ Department and the sole pregnant faculty member with a disability at CU.

80.     Furthermore, by the admission of Plaintiff's supervisors, it was quite common for attending ███████ to have complaints from a few residents.  Although ███████ and several other CU faculty asserted that complaints had come from sixteen (16) residents, only four (4) anonymous "complaints" had actually been presented.

81.     Without knowing their timing, identities and other pertinent data, it is impossible to ascertain whether these trainees had worked under Plaintiff's supervision or had even made complaints at all.

82.     Despite Plaintiff's multiple communications with CU on January 16, 2018, January 31, 2018, and February 1, 2018, in order to schedule a meeting to find a path to resolution, they refused to engage with her.

***Defendants' Retaliate by Refusing to Ensure Plaintiff A Reasonable Accommodation Based on her High-Risk Pregnancy, in Direct Violation of the ADA, ADAAA, and Rehab Act***

83.     In January 2018, during Plaintiff's pregnancy, Plaintiff was regularly assigned to cases involving radiation exposure.

84.     On January 9, 2018, Plaintiff provided a reasonable accommodation note from her doctor, requesting not to expose her to radiation due to complications of her pregnancy.

85.     Despite Plaintiff's assistance that she not be exposed to radiation, accompanied by a reasonable accommodation request with supporting correspondence from her physician, she was nevertheless repeatedly assigned to surgical cases requiring continuous exposure to radiation.

86.     Notably, the █████████ Department had eight (8) male physicians who could have performed those duties in her place.

87.     Of noted, a few days later, Plaintiff submitted information to the Office of the Medical Investigator indicating that gross waste of the VA's resources continued as work was being performed by external temporary workers from out of town being paid a very high hourly rate and lodging expenses, while Plaintiff's colleagues, who were being paid for a full-time position continued to be absent from the facility and unassigned to clinical duties while not on leave status.

***Plaintiff's clinical privileges are summarily suspended due to, in part, █████████'s conjured complaints***

88.     On February 14, 2018, the VA summarily suspended Plaintiff's clinical privileges and removed her from patient care without providing her any meaningful information to allow her to respond to the criticism raised about her work.

89.     Notably, none of Plaintiff's patients ever experienced an adverse outcome as a result of the care she provided, nor was there any evidence to support any concern regarding patient safety.

90.     Ultimately, a finding of unprofessional conduct was made against Plaintiff by the Professional Standards Council, approving revocation of her clinical privileges in reliance on the false premise that she had been subject to prior disciplinary action for cause based on the

uncorroborated hearsay from the University of Colorado without affording her any opportunity to rebut the claims.

91.     In early August 2018, Plaintiff was informed of the proposal, and later in August 2018 she was notified of the decision, to revoke her clinical privileges and remove her from federal service on a charge of unprofessional conduct based on the five alleged specifications, one concerning the complaints presented by ███████████.

92.     More specifically, the VA claimed as follows:

Between on or about May 1, 2016 and on or about December 1, 2017, while serving as an attending anesthesiologist, [Plaintiff was] unprofessional in [her] interactions with residents from the University of Colorado Anesthesiology Residency Program. Specifically, [she was] difficult to reach or not present during key parts of patient care, and [she] provided inadequate supervision and guidance to anesthesiology residents. [Plaintiff] also displayed a lack of effective, respectful, and professional communication with residents before, during, and after cases.

93.     In late August 2018, Plaintiff appealed that decision to a VA Disciplinary Appeals Board ("DAB").

94.     Around this same time, Plaintiff proactively self-referred to the Colorado Physicians Health Program ("CPHP"), an independent entity designated by the Colorado Medical Board to conduct professional assessments of physicians' fitness to practice medicine.

95.     CPHP reviewed the documentation related to VA's action against Plaintiff and a multi-disciplinary team conducted a complete evaluation of her case.

96.     Upon review, CPHP did not find any evidence of unprofessional conduct, communication issues or mental health disorders on Plaintiff's part and deemed her fit to practice medicine.

97.     On October 3 and 4, 2019, Plaintiff was given the opportunity to subpoena and depose the ███████████, ███████████ and ███████████, ███████████████████████ ███████████████████████.

98.     During ████████'s deposition on October 4, 2019, Plaintiff learned for the first time that the alleged complaints against her had not been investigated or verified and were wildly exaggerated.

99.     Through this deposition, Plaintiff learned that in September 2017, the ████████ ████ and ████████ were discussing Plaintiff, referring to her as the "problematic ████████."

100.    ████████ testified that it was in October 2017 that she met with certain residents during a monthly resident-attending meeting, during which a couple of residents may have voiced some concerns regarding Plaintiff.  Thereafter, Plaintiff solicited from these few residents written critiques of Plaintiff.

101.    These written concerns, as Plaintiff learned during this deposition, appeared to have been written by no more than four (4) residents.  Upon receiving these concerns, Defendant promptly forwarded them to the VA's ████████, without requesting additional information from the residents, or even verifying who made the complaints and what the circumstances were, or considering what she should be doing to remedy any purported miscommunications or issues.

102.    Indeed, if patient and resident safety was of any concern, ████████, as CU's Chair of the Department ████████, should have made some efforts to immediately address these issues with Plaintiff.

103.    Instead, ████████ testified that she had no independent knowledge of any of the alleged complaints, though she felt strongly enough to send them directly to the VA.

104.    Her deposition elucidated the actual motive behind ████████'s new-found concerns regarding Plaintiff's resident supervision—Defendants were attempting to create a damaging paper trail to be used in Plaintiff's eventual termination.

105.   Notably, although all four signatories to the December 2017 Letter were given the opportunity to provide input and edits, none of them took the time to verify the outrageous allegation that sixteen (16) residents had made complaints about Plaintiff

106.   To date, it is unclear how CU came to the specific number of sixteen (16) complaining residents.

107.   What ███████████'s deposition made suddenly apparent was that she, along with the other signatories to the December 2017 Letter, went out of their way to solicit and distort any negative feedback regarding Plaintiff to turn over to the VA.

108.   This was done in a fraudulent manner and had absolutely no basis in the promotion of resident or patient safety.  Rather, it was done for character assassination purposes and to vindictively end Plaintiff's career by providing the VA with a fabricated reason to terminate a Hispanic, female doctor who was bringing attention to problems that she observed at the VA and CU, as required under the terms of her employment agreement with CU.

109.   Nonetheless, in early December 2019, the DAB held a multi-day hearing and on January 15, 2020, in a Board Action, the DAB issued its findings upholding the five specifications set forth by the VA, one of which was the specification based upon ███████████'s conjured complaints.

110.   The DAB sustained the charge of unprofessional conduct and recommended upholding the VA's decision.

111.   On March 9, 2020, the VA took the final administrative action of approving and executing the DAB's Board Action (the "Adverse VA Action").

112.   Inexplicably, Plaintiff was not notified of the DAB's Board Action nor of the VA's final administrative action until June 30, 2020.

113.    Upon learning of same, Plaintiff then requested, in the interest of justice, that the VA postpone the effective date of its action pending judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701-06.

114.    In particular, under § 705, Plaintiff requested that the VA not file an adverse action report with the National Practitioner Data Bank nor report its action to the Colorado Medical Board because doing so would irretrievably injure her in her professional capacity before a court could set the action aside.



118.    In retaliation for expressing serious concerns as to the standard of care, CU took active steps to force Plaintiff out of her position, providing the VA with unsubstantiated allegations of unprofessional conduct, having failed to succeed with respect to her clinical proficiency.

119.    In fact, the VA, misrepresenting CU's "unusual decision" to "fire" her from supervising residents, a complete misuse of the term, disregarded evidence to the contrary.

120.    For example, evidence establishing that she exceeded expectations of resident staff in six categories, met expectations in three others, and adding positive comments, were ignored.

121.    Despite the fact that absolutely no patient care or outcome had been compromised, such a report would result in the loss of her license to practice medicine and completely destroy her professional reputation, and Defendants were well aware of this fact.

122.    Indeed, Defendants even posited that revoking Plaintiff's privileges and removing her would provide her with a "clean slate" moving forward, a preposterous conclusion given that sanctions have lasting, deleterious consequences which could never be erased.

123.    Nevertheless, it is Defendants intent to use this process in retaliation for the spotlight that has been directed on their operations from an ethnic minority employee.

***Plaintiff Files a Formal Complaint with the
Equal Employment Opportunity Commission and
Received a "Right to Sue" Letter***

124.    Following Defendants' active creation of a discriminatory, retaliatory, and hostile work environment in the Anesthesiology Department, Plaintiff was left with no choice but to seek further legal redress.

125.    On February 24, 2021, Plaintiff filed Charge of Discrimination No.: ███████ with the EEOC, in which she alleged that CU had discriminated against her based on her national origin, gender, sex (pregnancy), and disability, had retaliated against her, and had created a hostile work environment, in violation of Title VII.

126.    On November 18, 2021, the EEOC issued Plaintiff a notice of right to sue with respect to her Charge

***Impact of Defendants' Actions on Plaintiff***

127.    As a consequence of Defendants' conduct, the damage to Plaintiff's reputation and career cannot be overstated.

128.    As an ███████, Plaintiff's ability to work is largely limited to hospitals. Given CU's control over much of the state's hospital system, it has been nearly impossible for Plaintiff to find mitigating employment.  To date, she has been unable to do so and may be required to travel out of state to find comparable employment.  The facts outlined above show that CU acted

in bad faith, and with the overt intent to have Plaintiff removed from the VA and CU's faculty.  In doing so, their assertions against her have defamed her among her colleagues and have caused her significant emotional distress.

129.    The effects of the actions and decision will be to deprive Plaintiff of the ability to practice medicine and permanently end her career as a physician.  That will be the case because, under 42 U.S.C. §11133 and 11134 of the Health Care Quality Improvement Act ("HCQIA"), they must be reported to the Colorado Medical Board and, more significantly, to the National Practitioner Data Bank ("NPDB").  If the latter occurs, as a practical matter Plaintiff—who, as a cardiac anesthesiologist and critical care physician must have clinical privileges in order to practice medicine—will be unable to obtain privileges anywhere.  In short, her career will be over.

130.    In order to protect her license, Plaintiff has been forced to expend over $900,000.00 in legal fees to date.

131.    Of further significance, Plaintiff was restricted from practicing anesthesiology in Colorado, forcing her to travel out of state while pregnant during a global pandemic, leaving behind her husband and two (2) year old child, so as to maintain a "case log," required to be credentialed to work at a hospital.  Had she not extended such efforts to maintain a "case log", Plaintiff would never be able to work again in her specialty without retraining, despite her stellar academic credentials.  This would forever impact her standing in the specialty and she has already suffered a loss of income in excess of $350,000 per year.

132.    Plaintiff was unable to accept an excellent offer of employment at an even higher rate of remuneration because of the "baggage" which has been engendered by the revocation of her privileges.

133.    The financial impact of this retaliation is extraordinary, particularly given her age and the expected duration of her career.  Assuming a rate of pay of $500,000 per year (neither taking

into account benefits of employment, adjustments for interest, inflation, professional advancement, or customary salary increases), effective as of her age at the time of suspension and running until her eligibility for social security benefits at age 67, an entitlement to $10,000,000 simply for front and back pay and without inclusion of liquidated, punitive or other damages, is calculable using simple arithmetic.

134.    As such, Plaintiff has suffered direct financial loss, including, without limitation, loss of salary, loss of positions, both locally and nationally, loss of the ability to practice ████████ in Colorado, loss of the ability to return to work at CU, loss of her later career opportunities, loss of reputation on both a local and national level, and physical and emotional injuries.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Pregnancy Discrimination and Hostile Work Environment in Violation of Title VII of the Civil Rights Act against Defendant Board)

135.    Plaintiff incorporates the allegations in paragraphs 1 through 134 as if fully set forth herein.

136.    Plaintiff, as a then-pregnant woman, was a member of the class of persons protected from discrimination on the basis of sex (pregnancy) under Title VII.

137.    Defendant Board, by and through its agents, servants, and employees, intentionally engaged in unlawful employment practices against Plaintiff because, and while, she was pregnant.

138.    Defendant Board, by and through its agents, servants, and employees, discriminated against Plaintiff in connection with the terms, conditions and privileges of employment in violation of 42 U.S.C. § 2000e(2)(a).  The intent of these practices was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status because of her pregnancy.

139.    Defendant Board's unlawful employment practices had a disparate and adverse impact on Plaintiff because of her pregnancy.

140.    Plaintiff was subjected to a hostile work environment based upon membership in protected classes and suffered disparate treatment as a consequence thereof.

141.    Defendant Board, by and through its agents, servants, and employees, retaliated against Plaintiff because of her membership in protected classes, resulting in her separation from employment on pretextual grounds.

142.    Defendant Board is responsible and liable for the acts and omissions of its agents and employees.  Defendants have discriminated and retaliated against Plaintiff on the basis of sex (pregnancy).

143.    As a consequence of Defendant Board's conduct, Plaintiff has suffered damages and losses.

144.    Defendant Board's conduct was engaged in with malice or with reckless indifference to Plaintiff's federally protected rights within the meaning of Title VII.

**SECOND CLAIM FOR RELIEF**
(National Origin Discrimination and Hostile Work Environment in Violation of Title VII of the Civil Rights Act Defendant Board)

145.    Plaintiff incorporates the allegations in paragraphs 1 through 144 as if fully set forth herein.

146.    Plaintiff, as a Hispanic, is a member of the class of persons protected from discrimination on the basis of national origin under Title VII.

147.    Defendant Board, by and through its agents, servants, and employees, intentionally engaged in unlawful employment practices against Plaintiff because she is Hispanic.

148.    Defendant Board, by and through its agents, servants, and employees, discriminated against Plaintiff in connection with the terms, conditions and privileges of employment in violation of 42 U.S.C. § 2000e(2)(a).  The intent of these practices was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status because of her national origin.

149.     Defendant Board's unlawful employment practices had a disparate and adverse impact on Plaintiff because of her national origin.

150.     Plaintiff was subjected to a hostile work environment based upon membership in protected classes and suffered disparate treatment as a consequence thereof.

151.     Defendant Board, by and through its agents, servants, and employees, retaliated against Plaintiff because of her membership in protected classes, resulting in her separation from employment on pretextual grounds.

152.     Defendant Board is responsible and liable for the acts and omissions of its agents and employees.   Defendants have discriminated and retaliated against Plaintiff on the basis of sex (pregnancy).

153.     As a consequence of Defendants' conduct, Plaintiff has suffered damages and losses.

154.     Defendants' conduct was engaged in with malice or with reckless indifference to Plaintiff's federally protected rights within the meaning of Title VII.

**THIRD CLAIM FOR RELIEF**
(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended against Defendant Board)

155.     Plaintiff incorporates the allegations in paragraphs 1 through 154 as if fully set forth herein.

156.     Plaintiff opposed practices targeted at herself that were unlawful under Title VII, including discrimination based on sex (pregnancy) and national origin.

157.     As a result of Plaintiff's protected opposition to discrimination and the hostile work environment engendered and perpetuated by Defendants, Defendant Board, by and through its agents, servants, and employees, retaliated against her by subjecting her to different terms and conditions of employment as described in this Complaint, including, but not limited to, treating Plaintiff in a condescending matter, questioning her achievements, crediting accusations made

against Plaintiff that lacked basis, accusing Plaintiff of unprofessional conduct, failing to thoroughly and properly investigate or otherwise address Plaintiff's complaints about discrimination, making disparaging comments about Plaintiff to others, and ultimately forcing Plaintiff to resign from her position, that of which was tantamount to constructive termination.

158.    Defendant Board's conduct violated 42 U.S.C. § 2000e-3(a) of Title VII.

159.    As a direct and proximate result of Defendant Board's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation, and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of the enjoyment of life, and other non-pecuniary losses.

160.    Defendant Board's unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed, as legally permissible.

**FOURTH CLAIM FOR RELIEF**
(Discrimination in violation of the ADA and ADAAA, 42 U.S.C. §§ 12101, *et seq*. against Defendant Board)

161.    Plaintiff incorporates the allegations in paragraphs 1 through 160 as if fully set forth herein

162.    Plaintiff is a qualified individual within the meaning of 42 U.S.C. § 12111(8) in that at relevant times, she suffered from Placenta Previa and she had and maintains the requisite knowledge and education to perform and can perform the essential functions of her position as Assistant Professor of Anesthesiology, including clinical work in the operating room.

163.    Defendant Board is an "employer" within the meaning of 42 U.S.C. §§ 12111(5), in that it is engaged in an industry affecting commerce and has more than fifteen (15) employees on each working day in each of the twenty (20) or more calendar weeks in the current and preceding years.

164.     Defendant Board discriminated against Plaintiff by: (a) limiting, segregating or classifying Plaintiff is such a way as to adversely affect her status or opportunities because of actual or perceived disability within the meaning of § 12111(b)(1); (b) utilizing standards, criteria or methods of administration that have the effect of discrimination on the basis of disability within the meaning of § 12112(b)(3)(A); not making reasonable accommodations for known physical limitations of Plaintiff, an otherwise qualified individual with a disability who is an employee, despite the fact that Plaintiff requested same and that doing so would not impose an undue hardship on the operation of Defendant Board's business within the meaning of § 12112(b)(5)(A); (c) refused to properly engage in the interactive process regarding a reasonable accommodation; (d) utilizing qualification standards or other criteria with the specific intent to deny continuing employment opportunity to individuals with disabilities, despite the fact that doing so was not consistent with business necessity, within the meaning of § 12112(b)(6).

165.     Plaintiff has been damaged by Defendant Board's violation of the ADA inasmuch as Plaintiff has been unable to continue to use her education and training and clinical abilities.

166.     Plaintiff has been injured as a result of Defendant Board's actions or lack thereof.

167.     Plaintiff is entitled to any and all relief permitted under the ADA, 42 U.S.C. § 12117(a), as applicable to state entities, including injunctive relief.

168.     Defendants and refused to accommodate Plaintiff's disability.

## FIFTH CLAIM FOR RELIEF
(Retaliation in violation of the ADA and ADAAA, 42 U.S.C. §§ 12101, *et seq*. against Defendant Board)

169.     Plaintiff incorporates the allegations in paragraphs 1 through 168 as if fully set forth herein.

170.   Plaintiff engaged in protected opposition to Defendant Board's unlawful employment practice of discriminating because of her disability and failing to accommodate her disability.

171.   Defendant Board terminated Plaintiff's employment shortly after Plaintiff engaged in opposition to the unlawful employment practice and failed to reinstate her after she engaged in opposition to the unlawful employment practice.

172.   Plaintiff suffered adverse employment actions because of her opposition to Defendant Board's unlawful employment practice.

173.   Defendant Board's conduct was intentional, willful, wanton, and malicious.

174.   As a direct and proximate cause of Defendant Board's unlawful retaliation, Plaintiff has suffered and continues to suffer injury and damage for which she is entitled to compensation pursuant to the ADA and ADAAA.

**SIXTH CLAIM FOR RELIEF**
(Violation of § 504 of the Rehabilitation Act against Defendant
Board)

175.   Plaintiff incorporates the allegations in paragraphs 1 through 174 as if fully set forth herein.

176.   CU, by and through Defendant Board, is an entity which receives federal financial assistance and is a covered entity for the purposes of § 504 of the Rehabilitation Act. As such, Defendant Board is prohibited from discriminating against any "qualified individual with a disability."

177.   Plaintiff is a qualified individual that at the relevant time, had a disability.

178.   Plaintiff's particular disability substantially limited one or more of her major life functions and/or major bodily functions

179.    Plaintiff was and remained qualified to perform the essential functions required of her, with a reasonable accommodation.

180.    Defendant Board could accommodate Plaintiff without undue hardship.

181.    Defendant Board violated Section 504 of the Rehabilitation Act because it did not offer Plaintiff a reasonable accommodation for her actual disability, instead repeatedly forced to perform the work in the operating room without medically-necessary protection.

182.    Defendant Board failed to properly engage in any interactive process.

183.    Plaintiff has been injured as a result of Defendant Board's actions or lack thereof.

184.    Plaintiff is entitled to any and all relief permitted under the Rehabilitation Act.

185.    Plaintiff is entitled to attorneys' fees and cost incurred in this matter pursuant to 29 U.S.C. § 794a.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, Jane Doe, respectfully requests that this Court enter judgment in his favor and against Defendants and order the following relief against them respectively, to the extent provided by law:

    A.  Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

    B.  Back pay and benefits;

    C.  Injunctive and declaratory relief;

    D.  Front pay and benefits;

    E.  Attorneys' fees and costs of this action, including expert witness fees, as appropriate;

    F.  Pre-judgment and post-judgment interest at the highest lawful rate; and

    G.  Such further relief as justice requires or the law allows.

Furthermore, Plaintiff specifically prays that Defendants, in their official capacities be

enjoined from failing or refusing to:

    (1) provide sufficient remedial relief to make Plaintiff whole for the losses she suffered as a consequence of the discrimination and retaliation against her as alleged in this Complaint, including (a) offering Plaintiff full- or part-time employment, at his option, in his position with any necessary reasonable accommodations, and

    (2) take other appropriate non-discriminatory measures to overcome the effects of the discrimination and retaliation.

**<u>PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.</u>**

Respectfully submitted February 16, 2022.

                       By:    KATZ AND KERN, LLP

                             *s/ Chet Kern*

                             Chet W. Kern, Esq.
                             44 Cook Street
                             Denver, CO 80206
                             Tel: 303-398-7000
                             E-mail: ckern@katzandkernllp.com
                             Attorney     for     Plaintiff

## CERTIFICATION OF GOOD STANDING

I hereby certify that I am a member in good standing of the bar of this Court.

By:    KATZ AND KERN, LLP

*s/ Chet Kern*
_____

Chet W. Kern, Esq.
44 Cook Street
Denver, CO 80206
Tel: 303-398-7000
E-mail: ckern@katzandkernllp.com
Attorney       for       Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 16, 2022 I filed the foregoing with the Clerk of Court using the

CM/ECF system.

s/ Chet Kern

Chet W. Kern, Esq.